# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 26 2016, 7:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joann M. Price
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of C.F. and A.F. (Minor Children),

and

C.H. (Mother),
*Appellant-Defendant,*

v.

The Indiana Department of Child Services,

August 26, 2016

Court of Appeals Case No. 45A03-1603-JT-485

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Jr., Judge

Trial Court Cause Nos. 45D06-1410-JT-241, -242

**Crone, Judge.**

# Case Summary

[1] C.H. ("Mother") appeals the termination of her parental relationship with her children, C.F. and A.F. (collectively "the Children"). She asserts that she was denied due process based on her limited telephonic participation in the factfinding hearing. She also challenges the sufficiency of the evidence to support the termination order. Concluding that she has failed to preserve her due process claim for review and that the trial court did not clearly err in terminating her parental rights, we affirm.

# Facts and Procedural History[1]

[2] Mother and J.F. ("Father") were married and had two daughters, A.F. (born December 17, 2007) and C.F. (born May 13, 2009). The couple divorced in December 2012. Two months later, Mother and the Children moved to Florida, where Mother had relatives. Pursuant to court order, Mother and the Children had to move back to Indiana. They were accompanied by Mother's

---

[1] We note that Mother has failed to include in her appendix a chronological case summary as required by Indiana Appellate Rule 50(A)(2)(a). Her appendix consists almost entirely of portions of the transcript, which is prohibited by Appellate Rule 50(F).

new boyfriend ("Boyfriend").[2]  The group initially moved into Father's basement, but when conflict ensued, Mother and Boyfriend moved to a hotel and left the Children in the care of their paternal aunt ("Aunt") and her husband ("Uncle").  Soon after, Mother and Boyfriend changed hotels and brought the Children to live with them there.

[3]     In June 2013, the Department of Child Services ("DCS") investigated reports that Mother had punched C.F. in the eye, causing bruising.  Shortly thereafter, DCS removed the Children and filed a petition seeking to have them designated children in need of services ("CHINS") on the basis of neglect, instability, and physical abuse.  DCS placed the Children in relative care with Aunt, having determined that placement with Father was not feasible, as Father was a registered sex offender.[3]

[4]     On July 5, 2013, the trial court adjudicated the Children CHINS and ordered Mother and Father to participate in home-based services, initial clinical assessments with recommendations for parenting assessments and education, random drug screens, counseling, and supervised visitation.  By the end of July, Mother and Boyfriend had moved back to Florida.

---

[2] The record shows that Mother eventually married Boyfriend.  To alleviate confusion, we refer to him as Boyfriend throughout.

[3] According to the CHINS petition, Father admitted that he "took a plea agreement" to a child pornography charge but denied having committed the offense.  State's Exs. A, B.

[5] In October 2013, the trial court ordered Mother to participate in an Interstate Compact ("ICPC"), with the goal of reunifying the Children with Mother in Florida. As part of the ICPC, Mother was ordered to complete an initial clinical assessment, submit to drug testing, and attend therapy sessions. Boyfriend was also ordered to submit to a drug screen, which he refused to do. DCS family case manager ("FCM") Tanika Evans testified that she received no documentation indicating that Mother ever completed an initial clinical assessment. The first ICPC was closed due to noncompliance.

[6] In October 2014, DCS initiated a second ICPC for Mother at the home of her mother ("Grandmother"), as Mother was unemployed and living with her at that time. Grandmother refused to allow a home study to be conducted on her home, and Mother sought to have a home study completed on Boyfriend's parents' home. Boyfriend's parents did not want the Children to reside in their home and refused to complete the home study. The second ICPC was also closed due to noncompliance.

[7] In June 2015, DCS filed a petition for termination of Mother's and Father's parental rights, with a permanency plan of adoption by Aunt and Uncle. At the time of the factfinding hearing, Mother was unemployed and living in a tent in Florida. She appeared at the hearing by counsel and testified telephonically. Due to noise in the courtroom, Mother was not kept on an open line throughout the hearing but instead was instructed to stay by her phone in case counsel or the trial court needed to contact her.

The trial court issued findings of fact and conclusions thereon in an order terminating the parent-child relationships between Mother and Father and the Children. Mother now appeals.[4] Additional facts will be provided as necessary.

# Discussion and Decision

## Section 1 – Mother has waived her due process claim.

Mother maintains that she was denied due process when her telephonic participation in the factfinding hearing was limited to her examination as a witness. When seeking to terminate a parent-child relationship, the State must satisfy the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *S.L. v. Indiana Dep't of Child Servs.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013). This means that the State must proceed in a fundamentally fair manner that affords parents the opportunity to be heard at a meaningful time and in a meaningful manner. *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011). However, due process does not give a parent an absolute right to be *physically* present at the termination hearing. *In re K.W.*, 12 N.E.3d 241, 248-49 (Ind. 2014).

Although procedural irregularities during CHINS and termination proceedings may be of such significance that they deprive a parent of procedural due

---

[4] Father consented to termination and is not participating in this appeal.

process, the parent must raise due process at the trial level to avoid waiver. *S.L.*, 997 N.E.2d at 1120; *see also McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 194-95 (Ind. Ct. App. 2003) (a party may waive a constitutional claim, including due process, by raising it for the first time on appeal). Here, Mother was present by counsel and was examined telephonically during the factfinding hearing. Noting extraneous noise in the courtroom and limitations on where the speaker phone could be placed, the trial court chose not to keep her on an open line during the remainder of the hearing but instead admonished her to stay by her phone during the remainder of the hearing. Counsel agreed to the procedure, and Mother neither objected nor filed any motion after the hearing to indicate her objection to this procedure on due process grounds. As such, she did not give the trial court "a bona fide opportunity to pass upon the merits" of her constitutional issue before seeking

an opinion on appeal. *Endres v. Indiana State Police*, 809 N.E.2d 320, 322 (Ind. 2004). Consequently, Mother has waived review of her due process claim.[5]

## Section 2 – The trial court did not clearly err in terminating the parent-child relationship between Mother and the Children.

[11] Mother also challenges the sufficiency of the evidence to support the trial court's judgment terminating her parental relationship with the Children. When reviewing a trial court's findings of fact and conclusions thereon in a case involving the termination of parental rights, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We will set aside the trial court's judgment only if it is clearly erroneous. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We neither reweigh

---

[5] We note that the only objection to Mother's appearance by telephone was made by Father's counsel on the ground that it would be difficult to assess her body language over the telephone. The trial court responded that the court was (1) without resources and (2) under no legal obligation to bring Mother from Florida for the hearing. Tr. at 7-8. The trial court subsequently found as follows with respect to Mother's nonattendance at the factfinding hearing:

> Mother was unable to attend this fact finding hearing for her children due to lack of finances. This hearing has been set for months and Mother has not saved or obtained any funding to attend the hearing for the termination of her parental rights. Mother attempted to raise funds through a GoFundMe account to appear in person for the Fact Finding hearing and only raised thirty dollars ($30). Mother continued to quit jobs that gave her some type of income. Mother continues to live in a tent and has not obtained housing or employment. Mother had funding through relatives for a wedding, reception, honeymoon, van transmission etc., but could not find funding to attend the hearing to terminate her parental rights or to even put a roof over her head.

Appellant's App. at 4.

evidence nor judge witness credibility. *E.M.*, 4 N.E.3d at 642. Rather, we consider only the evidence and inferences most favorable to the judgment. *Id.* "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal." *Best v. Best*, 941 N.E.2d 499, 503 (Ind. 2011) (citations omitted).

[12] In *Bester*, our supreme court stated,

> The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. A parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests. Indeed the parent-child relationship is one of the most valued relationships in our culture. We recognize of course that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. Thus, parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.

839 N.E.2d at 147 (citations, quotation marks, and alteration omitted).

[13] To obtain a termination of the parent-child relationship between Mother and the Children, DCS was required to establish in pertinent part:

> (A) that one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

....

    (B) that one (1) of the following is true:

        (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

        (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

        (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

    (C) that termination is in the best interests of the child; and

    (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[14] In recognition of the seriousness with which we address parental termination cases, Indiana has adopted a clear and convincing evidence standard. Ind. Code § 31-37-14-2; *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 377 (Ind. Ct. App. 2006), *trans. denied.* "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by

the respondent parent's custody." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citation omitted).

## Section 2.1 – The trial court did not clearly err in determining that there is a reasonable probability that the conditions that led to the Children's removal will not be remedied.

Mother asserts that the trial court clearly erred in determining that there is a reasonable probability that the conditions that led to the Children's removal will remain unremedied.[6] When assessing whether there is a reasonable probability that conditions that led to a child's removal will not be remedied, we must consider not only the initial basis for the child's removal but also the bases for continued placement outside the home. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Moreover, "the trial court should judge a parent's fitness to care for [her] children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. "Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id*. For example, the court may properly consider evidence of a parent's substance abuse, criminal history, lack of employment or adequate

---

[6] Mother also challenges the trial court's conclusion that there is a reasonable probability that the continuation of her relationship with the Children poses a threat to their well-being. Indiana Code Section 31-35-2-4(b)(2)(B) requires DCS to prove only *one* of the three circumstances listed. Because we find no error concerning the reasonable probability of unremedied conditions, we need not address the threat to the Children's well-being.

housing, history of neglect, and failure to provide support. *McBride*, 798 N.E.2d at 199. In making its case, "DCS need not rule out all possibilities of change; rather, [it] need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[16] Here, the trial court issued extensive findings of fact.[7] With respect to the reasonable probability of unremedied conditions, the findings state:

> Mother indicated that she completed parenting classes through the divorce matter and did not participate in the classes offered through DCS.
>
> Approximately one month after the Children's removal, Mother returned to the State of Florida. Mother indicated that she did not have employment, transportation or housing …. Mother and Boyfriend intended to live with Boyfriend's mother. The Children continued to reside in the State of Indiana with the relatives [Aunt and Uncle].
>
> Mother indicated that when she went to Florida, she obtained employment at a dry cleaners …. A home study for the [first] ICPC was completed in February of 2014. The ICPC was denied due to Boyfriend's refusing to submit to a drug test. Mother continued to reside with Boyfriend even though he wouldn't comply with the ICPC in order for Mother to have a chance to have her children placed back in her care. The ICPC indicated that Mother needed to complete an initial clinical assessment, attend therapy and submit to drug testing. Mother testified that

---

[7] Many of the findings refer to the Children and others by name. We refer to them as previously designated herein.

she completed drug screens every week for six months, even though there are only six reports of drug screens ….

Mother appeared at a CHINS review hearing [and] indicated that she was residing with her grandmother. A second ICPC was initiated for Mother at the grandmother's home. Mother at that time did not have employment … [T]he grandmother would not allow a home study to be conducted on her home. Mother tried to have a home study completed on Boyfriend's parents' home, but they also refused home study …. [and] did not want the Children to reside in their home. The ICPC [was] again denied. Mother then moved back to Boyfriend's parents' home.

….

Mother married Boyfriend in March of 2015 and testified that she had a wedding, reception and went on a honeymoon. Mother indicated that she had employment from January until March of 2015 … [and] she quit the job, indicating that this was the third employment that Mother has voluntarily left ….

 ….

Mother obtained another job at a cleaning service … which she also quit ….

Mother and Boyfriend got kicked out of his parent's [sic] home in late September of 2015. Mother indicates that they moved to a campsite and were living in a tent. [T]hey are currently living in a tent in a relative's yard due to the campsite fees being too high … [and] she is currently paying the relative $80 per week to keep the tent in the yard …. Mother testified that she does not have any money ….

Clearly, the pattern of instability continues with Mother. Mother continues to be unemployed and continues to quit jobs that she

does obtain. Mother does not have stable housing and lives in a tent. Mother has no means to support herself and relies on Boyfriend for her financial stability. Boyfriend also is unstable. He also does not have stable housing and is living in the tent with Mother ….

…. Mother, currently has not remedied any of the reasons for the removal for the Children. Mother has not obtained stability and is unlikely to have stability in the near future …. The Children had been removed since July of 2013 and two and a half years later, Mother has made absolutely no progress in obtaining stability.

Mother was offered services through DCS to help her obtain stability in an effort to have her be reunified with the Children, but Mother left the State of Indiana and chose to leave with a man that she barely knew and met on the internet. The Court notes that she did eventually marry this man, but Mother chose to leave with him over staying in the State of Indiana and participating in the services offered in order to obtain reunification. Mother did not return to the State of Indiana ….

….

The Court notes that Mother is currently still unstable and if another ICPC was ordered, it would be denied due to Mother's continued instability …. Mother has made no efforts in order to obtain reunification. Mother has left the Children in the State of Indiana and Mother has not returned to the State, not even to visit the Children …. The Court notes the relatives in Florida will not help Mother in obtaining reunification with the Children and refused to participate in the ICPC and Mother is currently living in a tent and not with any of the relatives. Mother has not made the Children a priority in her life.

…. Mother did not follow through with the requirements from the first denial of the ICPC. Mother had unsupervised telephonic

contact with the Children that had to be converted to scheduled unsupervised telephone contact due to Mother['s] inconsistency with contacting the Children. The unsupervised telephone contact moved to supervised contact and then only therapeutic supervised telephone contact due to the lack of contact that Mother was having with the Children. Mother did not progress in her contact and continued to be sporadic which was confusing the Children. Due to the lack of communication, the lack of completion of services by Mother, lack of progression by Mother, lack of drug screens, DCS saw no point in submitt[ing] a second ICPC. But, a second ICPC was ordered … [and] Mother had one year to complete the services that were required from the first ICPC, which Mother failed to do ….

All services offered to Mother in order to obtain reunification failed. Mother did not show any commitment to the case plan or any commitment to the Children. Mother still has not obtained adequate housing. Mother has not been a consistent part of the Children's lives. Mother has not maintained any significant bond with the Children.

Appellant's App. at 2-5.

[17] One of the chief reasons for the Children's initial removal was Mother's instability. Her residences went from bad to worse, ranging from various hotels to various relatives' homes to a tent in Florida. At no time during the pendency of the proceedings did she maintain a stable home that would have been suitable for the Children. The Florida relatives clearly did not want the Children living with them, as was evidenced by their noncooperation with the second ICPC, and Mother received little to no support from Boyfriend, who refused to comply with the first ICPC.

[18] Similarly, Mother did not maintain a consistent record of employment. When she was employed, it was never for sustained periods. The record shows that she voluntarily left jobs at least three times, which precipitated the lack of funds that hindered her ability to visit the Children in Indiana or even to attend the factfinding hearing. Simply put, Mother created the circumstances that hindered her completion of ordered services when she decided to move to Florida during the pendency of the CHINS proceedings.[8] This includes supervised physical visitation with the Children. With respect to her telephonic visits, the record shows that she called the Children only sporadically and, even then, averaged only a few minutes per call. Mother's pattern with respect to telephonic visits illustrates a failure to earnestly commit to consistent visitation with the Children. *See Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (failure to exercise right to visit one's children demonstrates lack of commitment to complete actions necessary to preserve parent-child relationship), *trans. denied*.

[19] In sum, we agree with the trial court that Mother appears to have made no progress in breaking her patterns of instability. She initiated but did not complete the services ordered in Indiana and Florida. Therefore, we conclude that the trial court did not clearly err in determining that there is a reasonable

---

[8] The other reason cited by DCS for the Children's initial removal was the substantiated report of physical abuse. We note that there have been no reports of subsequent incidents. Whether this is largely due to Mother's physical absence from the Children for two and a half years, we can only speculate. What we do know is that she failed to complete the ordered services and take steps aimed at curtailing future incidents.

probability that the circumstances that led to the Children's removal will remain unremedied.

## Section 2.2 – The trial court did not clearly err in concluding that termination is in the Children's best interests.

[20] Mother also challenges the sufficiency of the evidence to support the trial court's conclusion concerning the Children's best interests. A determination of a child's best interests should be based on the totality of the circumstances. *In re A.P.*, 981 N.E.2d 75, 84 (Ind. Ct. App. 2012). Although not dispositive, permanency and stability are key considerations in determining the best interests of a child. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "[T]he testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed*.

[21] In its findings and conclusions regarding best interests of the Children, the trial court emphasized,

> The lack of Mother's consistency in their lives has damaged the Children …. The Children do not mention Mother and are very bonded in their relative placement. The Children's best interest is … to remain in their current placement because that is their family. It would be detrimental to the Children's well-being to be removed from their current placement.
>
> ……
>
> Neither parent is providing any emotional or financial support for the Children …. The Children have been removed from

parental care since July of 2013 and ha[ve] not been returned to parental care or custody. The Children are in relative placement with the Aunt and Uncle and bonded and thriving. The Children are happy and well adjusted in their placement.

….

Additionally, the Children deserve a loving, caring, safe, and stable home. The Children are bonded in their placement with Aunt and Uncle and are happy, healthy, thriving children, and the Children's needs for permanency are paramount and the Children cannot wait any longer for Mother to meet minimum standards of self[-]sufficiency.

It is in the best interest of the Child(ren) and their health, welfare and future that the parent-child relationship between the Child(ren) and their parents be forever fully and absolutely terminated.

Appellant's App. at 5-6.

[22]    Both FCM Julie Stalbaum and children's therapist Cheryl Golab testified that termination is in the Children's best interests. FCM Stalbaum testified that even when the permanency plan changed to adoption, she emphasized with Mother the importance of Mother showing strides in the areas of housing, employment, and telephone visitation, as well as the importance of Boyfriend (now her husband) becoming engaged in the process. This did not happen. In contrast, she reported that the Children were doing very well in their placement with Aunt and Uncle and were doing excellent in school. Therapist Golab, who had worked with the Children for two years, testified that they have been damaged by Mother's lack of consistency with the therapeutic telephone

visitation and that they consider Aunt and Uncle their family. She described the Children's relationship with Aunt and Uncle as "very positive, unconditional love. They love them just like they are their own children." Tr. at 204. FCM Evans testified at length concerning Mother's failure to complete services, unstable employment and housing, and inconsistent visitation. She emphasized that while Mother relied on her poor financial situation as an excuse for not completing services through the ICPC, those services could have been completed in Indiana at no charge had Mother not chosen to move to Florida. *Id.* at 154.

[23]  The totality of the circumstances reveals two young girls who have been out of Mother's care for two and a half years due to physical abuse and Mother's instability, with limited exposure to Mother via inconsistent phone calls, and who have been in a loving environment with the only consistent family that they have known during those years, Aunt and Uncle. The Children need the permanency and stability that Mother has not been able or willing to provide. The same Aunt who often pinch-hit for Mother when Mother chose other pursuits has, together with her husband, provided the one constant in the Children's lives. The trial court did not clearly err in concluding that termination of the parent-child relationship is in the Children's best interests.

## Section 2.3 – The trial court did not clearly err in determining that DCS has a satisfactory plan for the care and treatment of the Children.

Finally, Mother maintains that the trial court clearly erred in determining that DCS had established a satisfactory permanency plan for the Children. In order to terminate a parent-child relationship, the trial court must determine that DCS has a satisfactory plan for the care and treatment of the child. *In re D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. "This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *Id*. Adoption is a satisfactory plan for the care and treatment of a child under the termination statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009).

Mother's concern with respect to adoption appears to be that because Aunt is Father's sister, she will allow Father (a registered sex offender) to see the Children. Aunt testified to this effect. However, we note that the "satisfactory plan" analysis does not require that the trial court adopt the parent's view concerning which placement is best for a child, *see id*. (finding no clear error where DCS established plan for adoption by godparents rather than taking father's recommendation of placement with his sister as guardian). Mother complains that Aunt will allow Father to see the Children, yet she knew that Father was a sex offender and chose to leave the Children in Aunt's care, even for months at a time.

[26] The trial court was aware of Father's pornography conviction and sex offender status and emphasized that reunification with him is not possible. The court found that the Children were bonded with Aunt and Uncle and that the plan for adoption was satisfactory. The record is replete with testimony from professionals indicating that Aunt and Uncle were providing excellent care for the Children. In other words, while the trial court determined that Father was not a suitable parent, it was clearly satisfied that Aunt and Uncle were suitable parents. As such, we can infer that the trial court determined that Aunt and Uncle would handle any visits with Father in an appropriate manner and would comply with any legal restrictions on contact with the Children resulting from his designation as a sex offender. We find no clear error in the trial court's determination concerning this statutory element. Accordingly, we affirm.

[27] Affirmed.

Kirsch, J., and May, J., concur.